[No. B099424. Second Dist., Div. Two. Feb. 25, 1997.]

THOMAS LAURENCE TIBOR, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
GREGG DANIEL McNAMARA, Real Party in Interest.

**COUNSEL**

De Witt W. Clinton, County Counsel, Serritella & Paquette, Anthony P. Serritella, Dennis P. Riley and Ken A. Levine for Petitioner.

No appearance for Respondent.

Albert I. Kaufman for Real Party in Interest.

## OPINION

**BOREN, P. J.**—Petitioner, Thomas Laurence Tibor, a Los Angeles County deputy public defender, seeks a writ of mandate directing the superior court to set aside its order denying his motion for summary judgment.

### I. FACTUAL AND PROCEDURAL HISTORY

On November 12, 1991, real party in interest, Gregg Daniel McNamara, was charged with forcible rape with a deadly weapon. He was represented by Tibor from about November 22, 1991, to November 23, 1992. McNamara's defense was then turned over to another deputy public defender, Ramon Quintana. On March 15, 1993, McNamara sought and received permission to represent himself. During trial, the victim testified on direct examination but refused to be cross-examined. The case was dismissed, and in August 1993, McNamara was released from jail. McNamara then filed suit against Los Angeles County, Los Angeles County Public Defender Wilbur Littlefield, Quintana and Tibor for malpractice that he claims cost him 655 days of freedom.

McNamara alleged that he asked Tibor in November 1991 to obtain DNA testing because the results would show that he, McNamara, "was not the rapist." Tibor, however, failed to timely request the necessary court approval, obtain follow-up orders for appropriation of money to pay for the testing, and make certain the evidence was delivered to the DNA expert once he was appointed. As a result, it was "more than one year from the time of [McNamara's] arrest until the necessary evidence was obtained by the DNA expert so that he could commence testing." When the DNA analysis was finally completed in April 1993, the expert determined that "the samples produced for his testing excluded [McNamara] from the class of persons who could be the specimen donor." McNamara also claimed that Tibor "failed to timely locate and investigate alibi witnesses so that, in one case, a male witness" could not be located and a "female witness could not positively establish an alibi for [McNamara] which would have [led] to his exoneration."

Tibor and his codefendants moved for summary judgment. They characterized the pleadings as follows: "[McNamara] claims that if defendants had requested fewer continuances, [McNamara] would have gone to trial sooner and would have been acquitted of the charges and released at an earlier date." As to the breach of duty element, Tibor asserted that he was entitled to summary judgment because "there is no evidence that [he] committed legal malpractice." As to the element of causation, he claimed that McNamara, "[i]n order to show proximate cause in the context of a legal

malpractice claim" was required to "prove a nexus by showing that he would have received a better result *but for* the actions of the attorney."

Tibor's proposed statement of undisputed facts concerned the circumstances of the rape and McNamara's subsequent arrest. Tibor referenced McNamara's deposition testimony to prove that when McNamara was arrested on November 7, 1991 (two days after the rape), he was unable to provide the police with an alibi for two nights prior to the date of the rape. Tibor made no reference to his alleged negligence in failing to seek and pursue DNA testing or his alleged failure to locate and interview witnesses McNamara claimed could have provided him with an alibi had Tibor not delayed his investigation.

In addition to the foregoing evidence, Tibor submitted the following declaration: "I am an attorney duly licensed to practice law in the state of California. I presently work as a Deputy Public Defender for the Los Angeles County Public Defender's Office. From approximately late November 1991 until I left the Van Nuys branch in November or December 1992, I represented Gregg McNamara who was charged with committing rape with the use of a weapon. [¶] After receiving . . . McNamara's file, I performed all work which in my opinion was necessary to prepare the matter for trial. [¶] The work I did on . . . McNamara's behalf was done using the skill, prudence and diligence consistent with the members of my profession in the Los Angeles County legal community. None of the work I performed in providing legal services to . . . McNamara was outside the standard of care in the Los Angeles County legal community."[1]

Tibor concluded that based on the evidence submitted it was clear that he did not breach his duty of care to McNamara, and that McNamara had no

---

[1]During the summary motion proceedings, two issues arose with respect to declarations filed in a legal malpractice case. The first was whether plaintiffs such as McNamara are required, when faced with a declaration such as the one Tibor submitted, to refute the averments contained therein by submitting their own expert declaration. Where, as here, the issue involves a specialized area of the law, such a declaration should, in our opinion, be required. Here, for example, the case involved a public defender's alleged negligence in his representation of a criminal defendant charged with rape. A critical issue concerned the DNA testing. Questions to be answered included whether, under the circumstances of this case, DNA testing should have been requested, and if so, at what stage of the criminal proceeding court approval of an order appointing an expert should have been sought. Also at issue was whether, given the state of the law in 1991 and 1992, the DNA test results were likely to have been admitted. We do not mean to suggest that opposing expert declarations are required to be submitted in all cases of legal malpractice. However, the policy reasons for requiring such declarations in medical malpractice cases appear equally applicable in those cases involving the alleged malpractice of a criminal defense attorney. (See *Jeffer, Mangels & Butler* v. *Glickman* (1991) 234 Cal.App.3d 1432, 1438 [286 Cal.Rptr. 243].) The second issue which arose during the summary judgment proceedings was whether Tibor's declaration was sufficient. We conclude it was not since it did not meet the test set forth in *Salasguevara* v. *Wyeth Laboratories, Inc.* (1990) 222 Cal.App.3d 379, 385 [271 Cal.Rptr. 780], i.e., "whether

evidence showing a breach. Alternatively, Tibor asserted that even if the evidence supported a finding of breach of duty, the evidence conclusively established that his negligence was not the cause of McNamara's damages.[2]

In opposition to the defendants' motion for summary judgment, McNamara lodged an objection to the preliminary hearing testimony as inadmissible hearsay.[3] Attached to McNamara's opposition was his declaration and portions of the deposition testimony of the DNA expert who performed the tests on the evidence samples.

Tibor filed a reply, attached to which was an amended statement of facts. Many of the facts were essentially identical to those set forth in his moving papers. This time, however, they were supported by reference to the victim's trial testimony rather than to the preliminary hearing testimony. Tibor also submitted proposed facts concerning his reasons for failing to more timely request DNA testing. He cited the trial testimony of the rape victim who testified that, during the rape, her assailant withdrew before ejaculating. Tibor also submitted excerpts from his deposition testimony wherein he stated his reasons for not requesting the DNA in a more timely fashion. He believed the case would turn on identification issues, and he did not believe the DNA evidence would be helpful since if the DNA evidence did not indicate the involvement of McNamara, this circumstance would be consistent with the victim's testimony that the rapist withdrew prior to ejaculation. Tibor also believed that in most cases DNA evidence ends up proving the criminal defendant guilty.

As to his alleged delay in locating and interviewing the purported alibi witnesses, Tibor cited his deposition testimony wherein he stated that when he initially interviewed McNamara, McNamara gave three different incompatible alibis. As a result, Tibor formed the opinion that the presentation of three different alibis would not be beneficial to the defense.

---

the witness has sufficient skill or experience in the particular field so that his testimony would be likely to assist the jury in the search for the truth." Tibor's declaration contains no foundational facts showing that he has the training, experience or skill that would qualify him to render an opinion on the particular matters in controversy.

[2]Tibor also claimed, without much discussion, that McNamara had suffered only "nominal" damages as a result of his incarceration.

[3]The rape victim did not testify at the preliminary hearing. Instead, the investigating police officers, as they are allowed to do under Proposition 115, testified as to the victim's statements. Because Tibor and his codefendants referenced certain portions of the officers' testimony as proof of the facts concerning the rape, the hearsay objection was proper. Had Tibor cited the evidence for the limited purpose of showing that these were the facts he faced at the time of the preliminary hearing, the objection could have been overruled. The record reflects that the trial court did not specifically rule on McNamara's objection.

Tibor also cited his deposition testimony to explain that at least part of the delay in investigating the case and in requesting the DNA was due to the fact that in March 1992 he had become concerned with McNamara's mental health, and that as a result, a psychiatrist was appointed who declared McNamara incompetent to stand trial. The proceedings were halted until another psychiatrist declared McNamara competent.

Tibor also submitted excerpts from the deposition testimony of the DNA expert who performed the testing. Tibor claimed that the testimony supported the following facts: "DNA testing was completed and the evidence turned out to be damaging to McNamara. The DNA expert determined that the sperm was from [the rape victim's] boyfriend which was consistent with her boyfriend having had consensual intercourse. No other sperm was detected from inside [the rape victim] which was consistent with the rapist pulling out prior to ejaculation. The damaging evidence from the DNA expert was the DNA material present on one of [the rape victim's] pubic hairs was consistent with having come from McNamara."

In addition to introducing this new evidentiary material, Tibor, for the first time, cited authority for the proposition that in order for McNamara to prevail in his legal malpractice action, he would be required to prove, by a preponderance of the evidence, not only that Tibor's negligence caused him harm, but also that he is innocent of the crime charged.[4]

During the hearing, the court entertained argument primarily with respect to whether McNamara was required to submit an expert's declaration in opposition to Tibor's declaration. The court then denied Tibor's motion, finding that a triable issue of material fact existed as to whether Tibor had been negligent in his representation of McNamara. The court granted the motion as to Tibor's codefendants.[5]

---

[4]At the hearing on Tibor's motion for summary judgment, McNamara's counsel requested a continuance claiming it was necessary to enable McNamara to respond to the new evidentiary material submitted by Tibor; principally McNamara wanted time to counter the declaration submitted by Tibor should the court find that such a declaration was required. The court denied the continuance. We conclude that any error in denying the oral motion to continue was nonprejudicial. McNamara did not then and has not since pointed to an avenue of evidentiary discovery he could have successfully pursued. At the hearing, McNamara's counsel simply wanted an opportunity to provide an expert witness declaration to counter Tibor's regarding the standard of practice. Because our decision herein is grounded in lack of causation and failure to prove factual innocence, a continuance would not have materially assisted McNamara. (See *Thompson* v. *Halvonik* (1995) 36 Cal.App.4th 657 [43 Cal.Rptr.2d 142].)

[5]That portion of the court's ruling granting summary judgment to Tibor's codefendants is not before us.

Tibor then filed a petition for writ of mandate with this court. With no appropriate citation to the record,[6] he argued that he had met his burden on motion for summary judgment "by pointing to the absence of evidence necessary to prove all elements of [McNamara's] cause of action, shifting the burden to [McNamara] which he has failed to meet." He also reiterated his argument that in order to meet the burden of proving the element of causation, plaintiffs such as McNamara are required to prove their factual innocence of the crime charged.

When we denied the mandamus petition, Tibor sought review in the Supreme Court. There, for the first time, he asserted that "many jurisdictions have concluded that public defenders faced with substantial case loads, limited funding, restricted capacity to accept or reject cases, and clientele who are normally indigent and inordinately litigious, should be entitled to some form of immunity or legal protection from subsequent criminal malpractice lawsuits." Alternatively, he argued that even in the "absence of public defender immunity or protection" he was entitled to summary judgment as a matter of law.

The Supreme Court issued an order directing us to vacate our order denying Tibor's petition for writ of mandate and to set the matter for hearing. We did so.

## II. ISSUES PRESENTED

The issues presented here are whether Tibor was entitled to summary judgment, and whether public defenders, in general, are entitled to some form of protection when sued in a legal malpractice action brought by their former clients.

## III. DISCUSSION

### A. *Summary Judgment Rules*

Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd.

---

[6]California Rules of Court, rule 15(a) provides in pertinent part: "Each point in a brief shall appear separately under an appropriate heading, with subheadings if desired. Such headings need not be technical 'assignments of error' but should be concise headings which are generally descriptive of the subject matter covered. The statement of any matter in the record shall be supported by appropriate reference to the record."

(c.).[7] Under the 1992 and 1993 amendments to section 437c, a defendant moving for summary judgment "has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the [plaintiff's] cause of action . . . cannot be established . . . ." (§ 437c, subd. (o)(2).) Once the moving defendant has satisfied this obligation, the burden shifts to the plaintiff to demonstrate a triable issue of material fact as to the existence of the element or elements challenged by the defendant. (*Ibid.*) To do so, the plaintiff may not rely upon the "mere allegations . . . of its pleadings" and instead must show by "specific facts" that the requisite triable issue of material fact is present. (*Ibid.*)

▇▇ Section 437c, subdivision (o)(2) has been interpreted to mean that a defendant seeking a summary judgment now has two means by which to shift the burden of proof under subdivision (o)(2) to the plaintiff to produce evidence creating a triable issue of fact. (*Brantley* v. *Pisaro* (1996) 42 Cal.App.4th 1591, 1598 [50 Cal.Rptr.2d 431] (*Brantley*).) "The defendant may rely upon factually insufficient discovery responses by the plaintiff to show that the plaintiff cannot establish an essential element of the cause of action sued upon. [Citation.]" (*Ibid.*) Or, "the defendant may utilize the tried and true technique of negating ('disproving') an essential element of the plaintiff's cause of action. [Citation.]" (*Ibid.*)

"The task of resolving a defendant's motion for summary judgment will be facilitated by identifying at the outset the ground relied upon by the moving defendant. Is the defendant claiming the plaintiff cannot establish the cause of action pled (1) because the plaintiff's factually insufficient discovery responses demonstrate the plaintiff cannot prove an essential element of that cause of action; or (2) because the defendant's affirmative evidence discloses facts which negate the existence of an essential element of the plaintiff's claim by proving the contrary is true? If it is the latter, the court should evaluate defendant's evidence under the same strict standards which were held to apply to a defendant's attempt to disprove an element of the plaintiff's cause of action before the 1992 and 1993 amendments to section 437c, in order to avoid unjustly depriving the plaintiff of a trial. [Citations.]" (*Brantley, supra*, 42 Cal.App.4th at p. 1601.)

B. *Tibor's Motion for Summary Judgment*

▇▇ A review of Tibor's summary judgment motion reveals that he did not rely upon asserted factually insufficient discovery responses by McNamara to support the motion. Instead, he argued that McNamara's cause of

---

[7]All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

action for legal malpractice cannot be established as a matter of law (§ 437c, subd. (o)(2)) because the relevant undisputed facts prove that he, Tibor, did not breach his duty of care to McNamara. In the alternative, he argued that even if he did breach his duty of care, the relevant undisputed facts prove that the breach did not cause McNamara's damages. In other words, Tibor maintains that he has "disproved" two essential elements of McNamara's claim, i.e., breach of duty and causation.

## C. *Did Tibor Meet His Burden of Proof?*

■ We next consider whether Tibor satisfied his burden of proof under amended section 437c, subdivision (o)(2). In making this determination, we decide "de novo whether an issue of material fact exists and whether the moving party was entitled to summary judgment as a matter of law. [Citation.] In other words, we must assume the role of the trial court and reassess the merits of the motion. [Citation.] In doing so, we will consider only the facts properly before the trial court at the time it ruled on the motion. [Citation.]" (*Brantley*, *supra*, 42 Cal.App.4th at p. 1601.)

We carry out our appellate function by applying the same three-step analysis required of the trial court. We first identify the issues framed by the pleadings since it is these allegations to which the motion must respond. Second, we determine whether the moving party's showing has satisfied his burden of proof and justifies a judgment in movant's favor. When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable issue of material fact. (*Brantley*, *supra*, 42 Cal.App.4th at p. 1602.)

■ The issues framed by the pleadings are whether Tibor was negligent in failing to request the DNA testing in a more timely fashion, and whether he was negligent in failing to act more quickly in locating and interviewing witnesses McNamara claims would have provided him with an alibi.

### 1. *Breach of Duty*

It is obvious that Tibor, in those papers initially filed with the court, failed to satisfy his burden of proof with respect to the breach of duty element since no evidence was presented concerning either the DNA testing or alibi witness issues. Although Tibor introduced additional evidence in explanation of his alleged negligence in connection with his reply papers, we believe a triable issue exists as to whether Tibor breached his duty of care to

McNamara. In other words, a triable issue exists as to whether Tibor should have moved in a more timely fashion to have the DNA analysis performed. Tibor's evidence merely shows that a certain amount of delay could be expected while the issue of McNamara's competency was settled, and while he, Tibor, secured court approval. However, the evidence submitted by McNamara shows that he asked Tibor in November 1991 to seek court approval for DNA testing, and that Tibor did not seek such approval for about four months. The evidence also indicates that after Tibor secured the necessary court order, a further delay in delivering the necessary samples to the DNA expert occurred.

## 2. *Causation*

McNamara set forth two theories of his case. He claims that the DNA results conclusively established that he "was not the rapist," and that had Tibor obtained these results in a more timely fashion and presented them to the trial court in connection with a motion to dismiss, he, McNamara, would have been entitled to a dismissal as a matter of law, and would, therefore, have been released from custody much earlier. Alternatively, McNamara claims that had the DNA results, together with the alibi witnesses, been presented to a jury at an earlier date, a reasonable doubt would have been raised, he would have been found not guilty, and he would have been released much sooner.

Contained within this record is evidence which shows that the rape victim claimed that the rapist withdrew before he ejaculated, and that the victim had had sexual intercourse with her boyfriend sometime before the rape occurred. A review of the DNA expert's deposition testimony shows that when asked about the test results, the expert stated that he had excluded McNamara as a possible donor of the sperm detected on certain samples provided to the laboratory. As to the rape victim's boyfriend, the DNA expert opined, "[i]t could have been from him. In other words, he has alleles [telltale DNA markers] that could have been the alleles we detected."

Contrary to McNamara's contention, the DNA evidence does not "raise a reasonable doubt as a matter of law." Given the victim's testimony that the rapist withdrew before he ejaculated, the absence of McNamara's DNA would not have conclusively excluded him as the rapist. Nor would the fact that sperm traces were found on the samples which could not be traced to McNamara have assisted him in gaining a dismissal since the evidence was that the victim had had consensual sexual intercourse with her boyfriend sometime prior to the rape, and the boyfriend could not be excluded as the source of the sperm found on the sample. We conclude, therefore, that had

the DNA results been obtained at an earlier date and presented to the court in connection with a motion to dismiss, McNamara would not have been released because the motion to dismiss would have been denied.

We next consider McNamara's theory that, had the DNA results been presented to a jury at an earlier date, a reasonable doubt would have been raised and he would have been found not guilty. Had McNamara gone to trial earlier and presented the DNA evidence to the jury, his counsel would have argued that the absence of McNamara's DNA demonstrated that he was not the rapist. The prosecution would then, however, have argued that the results simply demonstrated the truth of the victim's assertion that the rapist withdrew before he ejaculated. It is far from certain that, had McNamara gone to trial with the DNA results, he would have been found not guilty. As we explain in the next part, however, a finding of "not guilty" is insufficient. What a plaintiff such as McNamara is required to prove—by a preponderance of the evidence—is that he is factually innocent of the crime with which he was charged. Moreover, it is for the judge, rather than the jury, to determine the issue of factual innocence.

## D. *McNamara's Burden of Proof*

■ What does a plaintiff, formerly a criminal defendant, have to prove in a legal malpractice action filed against his former defense counsel?

"The elements of a cause of action for attorney malpractice are: (1) the duty of the attorney to use such skill, prudence and diligence as members of the profession commonly possess; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage. [Citations.]" (*Schultz* v. *Harney* (1994) 27 Cal.App.4th 1611, 1621 [33 Cal.Rptr.2d 276].)

Courts that have considered the question have generally held that a former criminal defendant, in order to establish proximate cause, must prove, by a preponderance of the evidence, not only that his former attorney was negligent in his representation, but that he (the plaintiff) was innocent of the criminal charges filed against him. (See *Glenn* v. *Aiken* (1991) 409 Mass. 699, 702 [569 N.E.2d 783, 4 A.L.R.5th 1060] (*Glenn*), and cases cited therein; see also *Morgano* v. *Smith* (1994) 110 Nev. 1025, 1028-1029 [879 P.2d 735] [holding that while private criminal defense attorneys are not entitled to either qualified or complete immunity, they are entitled to the protection afforded by the requirement that a former criminal defendant must demonstrate that he obtained postconviction exoneration of the underlying offense and "prove actual innocence of the underlying charge"].)

*Glenn* is instructive. There, a criminal defendant was convicted of arson because of an error in the judge's charge. His trial counsel failed to properly preserve the issue for appellate review. The appellate court reversed the conviction because the error in the judge's charge created a substantial risk of a miscarriage of justice. A decision was made not to retry the defendant. He then filed suit against his former trial counsel for malpractice that he claimed cost him 14 months of freedom. The defendant attorney moved for summary judgment which was granted. (*Glenn*, *supra*, 409 Mass. at p. 700 [569 N.E.2d at p. 784].) Although the summary judgment ruling was reversed on appeal, the court held that, in order to prevail in his legal malpractice action, the plaintiff would be required to prove, by a preponderance of the evidence, his innocence of the criminal charges filed against him. (*Id.* at p. 707 [569 N.E.2d at p. 788].)

We recognize that such a rule may relieve a criminal defense attorney of liability for harm that his client suffered only because of the defense counsel's negligence. However, we, like the *Glenn* court, believe that sound public policy reasons support such a rule. "Most criminal defendants . . . are represented by counsel appointed at public expense or private counsel whose fees are not substantial. The public has a strong interest in encouraging the representation of criminal defendants, particularly those who are ruled to be indigent. The rule we favor helps to encourage that kind of legal representation by reducing the risk that malpractice claims will be asserted and, if asserted, will be successful." (*Glenn*, *supra*, 409 Mass. at pp. 707-708 [569 N.E.2d at pp. 878-788].)

 McNamara contends that a requirement that plaintiffs in a malpractice action prove by a preponderance of the evidence that they did not actually commit the crime with which they were charged, imposes upon such plaintiffs an unnecessary burden, which has no basis in tort law. We disagree. As the *Glenn* court stated: "There is good reason to place a greater burden on a guilty criminal defendant maintaining a claim of malpractice of the type involved in this case than is placed on a wronged civil defendant. The underpinnings of common law tort liability, compensation and deterrence, do not support a rule that allows recovery to one who is guilty of the underlying criminal charge. A person who is guilty need not be compensated for what happened to him as a result of his former attorney's negligence. There is no reason to compensate such a person, rewarding him indirectly for his crime. The possibility that a criminal defendant may not be guilty provides a sufficient, general deterrent against negligent conduct of defense counsel, without the need for providing a tort remedy for guilty former criminal defendants." (*Glenn*, *supra*, 409 Mass at p. 707 [569 N.E.2d at p.

788].)[8] Moreover, our system of criminal justice provides alternative malpractice relief to the aggrieved criminal defendant by allowing claims of ineffective assistance of counsel. (See *Younan* v. *Caruso* (1996) 51 Cal.App.4th 401, 408-409 [59 Cal.Rptr.2d 103].)

### E. Trial Court's Duty

■ Where, as here, a public defender charged with legal malpractice by a former client brings a motion for summary judgment, and evidence is presented by both the plaintiff and defendant showing the circumstances surrounding the crime for which the plaintiff was arrested, we believe the court is required to consider as a threshold issue, the issue of factual innocence.

We have concluded that, as a matter of sound public policy, a former criminal defendant, in order to establish proximate cause, must prove, by a preponderance of the evidence, not only that his former attorney was negligent in his representation, but that he (the plaintiff) was innocent of the criminal charges filed against him. The question, of course, is what a public defender charged with legal malpractice is required to prove should he bring a motion for summary judgment in such a case. We are of the opinion that a public defender is required to demonstrate that a reasonable cause exists to believe that the plaintiff committed the offense for which the arrest was made. The burden then shifts to the plaintiff to "establish that facts exist which would lead no person of ordinary care and prudence to believe or conscientiously entertain any honest and strong suspicion" that he, plaintiff, is guilty of the crimes charged. (*People* v. *Matthews* (1992) 7 Cal.App.4th 1052, 1056 [9 Cal.Rptr.2d 348].) The court would then be required to make a finding, as a matter of law, as to the issue of factual innocence. Should the court find that a reasonable cause exists to believe that the plaintiff committed the offense for which the arrest was made, the court would be required to grant the public defender's motion for summary judgment since such a finding, in effect, means that the plaintiff cannot, as a matter of law, prove by a preponderance of the evidence that he is innocent of the criminal charges filed against him. Thus, the question of factual innocence is wholly one for the trial court and not for the jury.

Our conclusion, grounded as it is in public policy, finds some legislative support by reference to Penal Code section 851.8, which sets forth the

---

[8]Tibor invites this court to utilize certain sections of the Government Code as a basis for extending some form of immunity to public attorneys. Nothing contained within the statutes cited suggests the Legislature intended to afford such protection. We therefore decline the invitation. Nor are we willing to classify public defenders as a "special class of private attorneys" as a basis for a grant of some type of quasi-judicial immunity. Public defender immunity is an issue best addressed by the Legislature.

guidelines for sealing and destroying the arrest records of a person who is factually innocent. Where a person has been arrested and an accusatory pleading filed but no conviction has occurred, the defendant may "petition the court which dismissed the action for a finding that the defendant is factually innocent of the charges for which the arrest was made." (Pen. Code, § 851.8, subd. (c).) "A finding of factual innocence and an order for the sealing and destruction of records . . . shall not be made unless the court finds that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made. In any court hearing to determine the factual innocence of a party, the initial burden of proof shall rest with the petitioner to show that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made. If the court finds that this showing of no reasonable cause has been made by the petitioner, then the burden of proof shall shift to the respondent to show that a reasonable cause exists to believe that the petitioner committed the offense for which the arrest was made." (Pen. Code, § 851.8, subd. (b).)

 McNamara based his case upon two theories. The first was that the DNA test results conclusively demonstrated that he was not the rapist. As discussed, no such conclusion can be drawn given the facts of this case. His second theory was that, had the DNA results been obtained sooner and had the alibi witnesses been located, he could have presented the facts to a jury and the jury could have found a reasonable doubt and acquitted him. While the criminal jury could have done so, the court in the legal malpractice action would still have been required to determine whether a reasonable cause existed to believe that McNamara committed the rape for which he was arrested. Had the court been able to determine that McNamara was factually innocent (on this record no such determination is possible), the trial court could have then denied Tibor's summary judgment motion (assuming sufficient evidence of causation). A jury could have thereafter determined the remaining malpractice issues.

After reviewing the evidence submitted by McNamara in connection with this mandamus petition, we conclude, as a matter of law, that a reasonable cause exists to believe that McNamara committed the rape for which he was arrested.

## IV. DISPOSITION

Accordingly, the writ is granted. The superior court is directed to set aside its order denying Tibor's motion for summary judgment, and to enter a new

and different order granting Tibor's motion. The temporary stay is vacated. The parties are to bear their own costs.

Fukuto, J., and Nott, J., concurred.

A petition for a rehearing was denied March 14, 1997, and the petition of real party in interest for review by the Supreme Court was denied May 28, 1997.