[No. G032270. Fourth Dist., Div. Three. July 28, 2005.]

CHAD SALISBURY, Plaintiff and Appellant, v.
COUNTY OF ORANGE et al., Defendants and Respondents.

## COUNSEL

Law Office of William J. Kopeny & Associates and William J. Kopeny for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Nancy E. Zeltzer and Gary M. Lape for Defendants and Respondents.

## OPINION

**SILLS, P. J.**—Chad Salisbury was convicted of felony assault with a hate crime enhancement. He obtained a new trial based on newly discovered evidence and the ineffective assistance of his counsel, an Orange County deputy public defender. On retrial, he was acquitted. Salisbury then brought this action for legal malpractice against the public defender.

The trial court bifurcated the issue of Salisbury's actual innocence and tried it without a jury; it found Salisbury had not met his burden of proof and entered judgment against him. On appeal, Salisbury contends he was entitled to a jury determination of his actual innocence because the decision rests on the credibility of witnesses. We agree and reverse.

### FACTS

Salisbury was charged with assault with a deadly weapon, plus enhancements for inflicting great bodily injury and the commission of a hate crime. The charges arose out of the August 1995 beating of Mark David following a rock concert in Orange. At trial, Salisbury was represented by an Orange County deputy public defender. A jury found him guilty of assault with a deadly weapon and the hate crime enhancement; it found him not guilty of the infliction of great bodily injury. After his conviction, Salisbury retained private counsel, who brought a motion for new trial based on newly discovered evidence and the ineffective assistance of counsel. The motion was granted and a new trial ordered. The jury in the second trial found Salisbury not guilty of any of the charges.

Subsequently, Salisbury filed this action against the Orange County Public Defender's Office for legal malpractice. He alleged he was not guilty of the charged offenses, and but for the negligence of the public defenders, he would not have been convicted. At the commencement of trial, the court determined that the question of Salisbury's factual innocence, a prerequisite to a claim of malpractice based on a criminal case, was a question of fact for

the trial court, not the jury. Notwithstanding, a jury was impaneled, and both it and the court heard evidence from numerous witnesses.

Scott Troske testified that on August 5, 1995, he was a member of a punk rock band called Drain Bamaged. His band was one of four in the show at a venue in Orange. He noticed some "Nazi Skinheads" in the crowd, whom he identified by their clothing and behavior. While his band was playing, the "Nazi Skinheads" were "throwing seig heils," "pushing people around. Being a little more rough than the rest of the people who were just trying to have fun dancing." When the lead band, Fear, took the stage, the problems escalated. Fear's lead guitar player was an African American, and the Nazi Skinheads began calling him "nigger." One jumped up on the stage and swung at the guitarist, causing the band to stop playing. A fight broke out and the security guards began to clear the hall.

Troske went up on the stage to talk to Fear's singer; Salisbury was also there, talking to the singer. Troske then went outside to guard Fear's van and saw "an attack on a dark complected male," whom he identified as Mark David. Troske knew David from other concerts, and the two were friends. Some of the Nazi Skinheads spotted David and a Caucasian male standing by a car. One said, "Look, there is one of them. Let's get him." A group of them ran over and jumped on David, kicking and stomping on his head and body. Although Troske was afraid for himself, he ran to the scene and "started pulling people off, pushing them out of the way. Yelling at them, cursing and swearing. Just getting them off him and trying to get them to leave him alone because I thought they were going to kill him. It did not look good." The situation was chaotic, but Troske got a "fairly good look" at the people he was pulling off, "for the most part." He did not see Salisbury during the attack. Troske thought he was the only person pulling people off David, but he admitted he "may not have noticed" if there were someone else "at the end of the car or side of the car also pushing, knocking people out of the way . . . ."

About 15 or 20 minutes later, the police determined that Salisbury was a suspect and asked Troske to assist in a field I.D. When asked whether Salisbury was the person that committed the attack, Troske said, "No." Someone to his right, however, identified Salisbury as one of the attackers.

Shannon Sherman testified she was 15 at the time of the incident, and she went to the show with her boyfriend and some other friends. After security cleared the hall, Sherman was walking toward their car when she saw someone being attacked. "I observed somebody run under the car and get drug out from the car and then somebody jumped off the top of the car onto his chest. And they began hitting him, kicking him." She identified the person

jumping onto the victim as Kevin Dale, whom she knew through her boyfriend. Other people were also jumping off the car onto the victim, and still others were beating him, but none of them was Salisbury. Sherman knew Salisbury "by sight," also through her boyfriend.

Salisbury testified he was raised as a Jew and currently held that religious belief; he would never be a member of a group that supported the killing of Jews. On the night of the show, he left the hall when directed to do so. Outside, he found a "chaotic" situation, which he avoided by moving to "the other side of the parking lot and wait[ing] for my friends." After a few minutes, however, he decided to go back inside to talk to Fear's lead guitarist. When he re-emerged, he was accused of being "one of the people" and was detained by an officer. Subsequently, he was arrested.

Gene Reil testified that he attended the show on August 5, 1995. At that time, he was a U.S. Marine, living on base at Camp Pendleton. He noticed Salisbury, whom he had never seen before, "walking around inside the facility" during a break in the show, before Fear came on stage. Salisbury attracted Reil's attention because of his tattoos. Reil had been at the venue about half an hour when the "commotion" started. He identified the group of people "screaming profanities and seig heils" as Skinheads. "They started chanting zeig heils and they repeatedly used the word 'nigger, nigger, nigger' over and over again. Things of that nature." Like Troske, Reil testified that one of the Skinheads jumped on the stage and a fight broke out.

Reil went outside to wait by Fear's van so he could help them load their equipment. He saw an angry group of skinheads pounding on the now-locked doors to the hall, "chanting 'let the nigger out.' " One of the Skinheads "grabbed a kid and said, 'Hey, I got one, I got one, I got one.' " Reil later learned this was Mark David. The Skinhead who grabbed David pulled him toward a car; 15 or 20 other Skinheads joined him. When they disappeared from view behind the car, Reil and "the other guy from the musical group that was playing, we started going over and yelling the cops were coming, trying to scare them away."

As Reil came around the car, he saw "people swinging their arms, kicking." He then saw two men jumping over the front of the car on the hood and then down into the crowd of people beating David. One of these men was Salisbury. Reil saw him "swinging his fists down towards where Mr. David was." He was "hunched down towards the victim swinging. [¶] . . . [¶] It was frantic, like a continuous swinging motion." Reil testified at one point Salisbury had "a pole in his hands, that he was striking down."

Reil and "the other guy" started pulling people off David, and the Skinheads dispersed. As Reil was kneeling down assisting David, he heard

someone say " 'he got what he deserved,' or 'we gave him what he deserved,' something to that effect. I looked up and it was Mr. Salisbury standing there." By this time, there were police on the scene, and Reil pointed out Salisbury to one of them and said he was involved. He later identified Salisbury as one of the persons attacking David. Reil was certain he correctly identified Salisbury. In addition to his tattoos and his clothing, Salisbury was tall, one of the biggest guys Reil saw that night.

The parties stipulated that the criminalist from the Orange County Sheriff's Department would testify she examined Salisbury's boots and clothing he was wearing that night and did not find any blood on them.

The trial court found Salisbury had not established his actual innocence and dismissed the case for a failure of proof. At Salisbury's request, the court issued a statement of decision. It found that Reil's testimony was credible and consistent with that of Troske. Reil's identification of Salisbury was "unequivocal." Troske's testimony that he did not see Salisbury during the attack was not inconsistent with Reil's testimony "considering Troske's state of mind and understandable concentration on the altercation. Troske testified he approached the scene of the altercation alone. Reil testified that he also approached the scene of the altercation as it was starting behind another person approaching the scene and assisted in the removal of people from David." The court inferred that both Reil and Troske approached and observed the assault at the same time. "Considering the influence of fear on Troske, greater weight was placed on the observations of Reil. Reil was a former Marine and his observations were not influenced by the fear that influenced Troske."

## DISCUSSION

Salisbury contends the trial court erred in not allowing the jury to make the determination of his actual innocence. We agree.

■ When a person sues his former attorney for legal malpractice in the civil arena, he must prove a breach of the attorney's duty to use professional skill, a causal connection between the breach and the injury, and actual loss or damage. (*Wiley v. County of San Diego* (1998) 19 Cal.4th 532, 536 [79 Cal.Rptr.2d 672, 966 P.2d 983].) If the alleged malpractice occurred during the defense of a person accused of a crime, however, most courts require the malpractice plaintiff also to obtain relief from the judgment of conviction and prove his actual innocence by a preponderance of the evidence in the subsequent civil malpractice action. (*Id.* at p. 545; *Coscia v. McKenna & Cuneo* (2001) 25 Cal.4th 1194 [108 Cal.Rptr.2d 471, 25 P.3d 670].)

The California Supreme Court adopted the requirement of proof of actual innocence in *Wiley v. County of San Diego, supra*, 19 Cal.4th 532. There, the malpractice plaintiff, after successfully overturning his conviction for battery causing great bodily injury on a habeas corpus petition, brought a malpractice action against the public defender who represented him in the criminal trial. During motions in limine, the trial court decided it was irrelevant whether the malpractice plaintiff was actually innocent of the crime for which he was convicted and refused to submit the issue to the jury. The jury found in favor of the malpractice plaintiff and the defendant attorney appealed, challenging, among other things, the trial court's ruling on the issue of actual innocence. The Court of Appeal reversed the judgment on other grounds, but declined to require proof of actual innocence as a condition of recovery. (*Id.* at p. 535.)

Disagreeing with the appellate court, the Supreme Court held that actual innocence is a necessary element of a cause of action for legal malpractice brought by a former criminal defendant, "[f]or reasons of policy and pragmatism . . . ." (*Wiley v. County of San Diego, supra*, 19 Cal.4th at p. 534.) The court explained, "Regardless of the attorney's negligence, a guilty defendant's conviction and sentence are the direct consequence of his own perfidy. The fact that nonnegligent counsel 'could have done better' may warrant postconviction relief, but it does not translate into civil damages, which are intended to make the plaintiff whole. . . . [¶] Only an innocent person wrongly convicted due to inadequate representation has suffered a compensable injury because in that situation the nexus between the malpractice and palpable harm is sufficient to warrant a civil action . . . ." (*Id.* at p. 539.)

The court dismissed the concerns expressed by some courts that the requirement of the malpractice plaintiff's actual innocence would unfairly relieve criminal defense counsel from all liability for negligence when representing a guilty defendant. "This theoretical dilemma" exists when a criminal malpractice case is compared too literally to a civil malpractice case. (*Wiley v. County of San Diego, supra*, 19 Cal.4th at p. 540.) The safeguards of the criminal justice system, " 'bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free' " (*id.* at p. 541), sometimes result in the acquittal or dismissal of a guilty defendant. If defense counsel's failure to secure the benefit of these safeguards for his client results in a violation of the defendant's constitutional right to the effective assistance of counsel, "any lapse can be rectified through an array of postconviction remedies, including appeal and habeas corpus. Such relief is afforded even to those clearly guilty as long as they demonstrate incompetence and resulting prejudice . . . ." (*Id.* at p. 542.)

The Supreme Court affirmed the Court of Appeal's reversal of the trial court and remanded the case for further proceedings in light of the reversible errors noted by both courts. It remarked, "Therefore, on retrial [plaintiff] will have to prove by a preponderance of the evidence that he did not commit battery with serious bodily injury." (*Wiley v. County of San Diego, supra,* 19 Cal.4th at p. 545.)

■ *Wiley* clearly established that actual innocence is an additional element of a cause of action for criminal malpractice, not supplanting but supplementing the civil malpractice elements of " '(1) the duty of the attorney to use such skill, prudence and diligence as members of the profession commonly possess; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage.' [Citations.]" (*Wiley v. County of San Diego, supra,* 19 Cal.4th at p. 536.) *Wiley* also agreed with the majority of other courts, which hold that like the civil elements, the additional element of actual innocence is part of the plaintiff's burden of proof. (*Id.* at p. 544; cf. *Shaw v. State, Dept. of Admin.* (Alaska 1993) 861 P.2d 566, 570 [actual guilt of the malpractice plaintiff treated as an affirmative defense, with burden of proof on defendant attorney].) It follows that a criminal malpractice plaintiff has the same right to a jury trial on the element of actual innocence as he would have on the civil elements.

■ The California Constitution guarantees the right to a jury trial in a civil action at law. (Cal. Const., art. I, § 16; *American Motorists Ins. Co.* (1998) 68 Cal.App.4th 864, 871 [80 Cal.Rptr.2d 621].) A claim for negligence based on legal malpractice is a civil action at law, and "a jury trial is a matter of constitutional right." (*Ceriale v. Superior Court* (1996) 48 Cal.App.4th 1629, 1635 [56 Cal.Rptr.2d 353].) Even where the underlying action is equitable, the right to jury trial in the legal malpractice case prevails. (*Ibid.*) In *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953 [105 Cal.Rptr.2d 88], the court explained that a malpractice plaintiff had the right to a jury trial on the "trial-within-a-trial" aspect of his case, notwithstanding the underlying case would have been before specialized arbitrators regarding complex issues. "[I]n legal malpractice cases, whether a court or jury decides the underlying case-within-a-case does not turn on the identity or expertise of the trier of fact, but whether the issues are predominately questions of fact or law." (*Id.* at p. 970.)

The question of actual innocence is inherently factual. While proof of the government's inability to prove guilt may involve technical defenses and evidentiary rules, proof of actual innocence obliges the malpractice plaintiff "to convince the civil jurors of his innocence." (*Hicks v. Nunnery* (2002) 253

Wis.2d 721, 748–749 [643 N.W.2d 809].) Thus, the determination of actual innocence is rooted in the goal of reliable factfinding. (*Shaw v. State, supra,* 861 P.2d at pp. 570–571.)

The trial court and the county rely on *Tibor v. Superior Court* (1997) 52 Cal.App.4th 1359 [61 Cal.Rptr.2d 326] as support for the argument that the question of actual innocence is one for the court, not the jury. In *Tibor,* a deputy public defender was sued for malpractice by a former criminal defendant who was charged with forcible rape with a deadly weapon. During trial, the victim refused to be cross-examined, and the case was dismissed. The plaintiff claimed Tibor failed to obtain DNA testing, which would have excluded the plaintiff as the rape perpetrator, and failed to timely locate and investigate alibi witnesses. The trial court denied Tibor's motion for summary judgment, finding a triable issue of fact regarding whether Tibor was negligent in his representation of the plaintiff.

On appeal, Tibor argued the plaintiff had failed to establish his actual innocence of the rape charge. The court agreed, finding the malpractice plaintiff was required to prove actual innocence of the rape charges and, on a motion for summary judgment, the trial court is required to consider factual innocence as a "threshold issue." (*Tibor v. Superior Court, supra,* 52 Cal.App.4th at p. 1372.) Where the attorney defendant is the party moving for summary judgment, and "evidence is presented by both the plaintiff and defendant showing the circumstances surrounding the crime," the defendant "is required to demonstrate that a reasonable cause exists to believe that the plaintiff committed the offense for which the arrest was made. The burden then shifts to the plaintiff to 'establish that facts exist which would lead no person of ordinary care and prudence to believe or conscientiously entertain any honest and strong suspicion' that he, plaintiff, is guilty of the crimes charged. [Citation.] The court would then be required to make a finding, as a matter of law, as to the issue of factual innocence. . . . Thus, the question of factual innocence is wholly one for the trial court and not for the jury." (*Tibor v. Superior Court, supra,* 52 Cal.App.4th at p. 1373.)

The court found as a matter of law that "reasonable cause exists to believe that [the plaintiff] committed the rape for which he was arrested"; in fact, the court remarked, "[O]n this record no . . . determination [of factual innocence] is possible . . . ." (*Tibor v. Superior Court, supra,* 52 Cal.App.4th at p. 1374.) Thus, the court held, the attorney defendant's motion for summary judgment must be granted "since such a finding, in effect, means that the plaintiff cannot, as a matter of law, prove by a preponderance of the evidence that he is innocent of the criminal charges filed against him." (*Id.* at p. 1373.)

The county urges us to conclude that *Tibor's* holding removes the question of actual innocence from the jury in all circumstances and places it

squarely in the lap of the trial court. But we conclude *Tibor* must be limited to a summary judgment motion where there is no triable issue of fact on actual innocence; any other reading of *Tibor* would contravene a malpractice plaintiff's right to a jury trial.

■ This record contains evidence raising a triable issue of fact regarding Salisbury's actual innocence. His own testimony, together with that of Troske and one other witness, was that he was not the one who assaulted David. There is also the testimony of a criminalist who found no blood on Salisbury's clothes and shoes notwithstanding testimony that David was lying in a pool of blood. While the trial court determined this evidence was overshadowed by Reil's testimony, which it specifically found to be credible, a jury might have reached a different conclusion. Salisbury was entitled to submit the question of his actual innocence to a jury.

## DISPOSITION

The judgment is reversed and the case is remanded to the trial court for further proceedings. Appellant is entitled to costs on appeal.

Rylaarsdam, J., and Bedsworth, J., concurred.

A petition for a rehearing was denied August 17, 2005, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied October 26, 2005.