## Humberto Correia *vs.* James H. Fagan & others.[1]

Suffolk. April 8, 2008. - August 5, 2008.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Cordy, & Botsford, JJ.

*Attorney at Law,* Malpractice. *Evidence,* Legal malpractice. *Practice, Civil,* Summary judgment.

Discussion of the elements that a plaintiff seeking to prevail on a claim of legal malpractice must establish, and of the requirement that a plaintiff who is a former criminal defendant claiming that his or her defense attorney negligently defended the plaintiff against the criminal charge prove, by a preponderance of the evidence, not only that the negligence of the attorney caused the plaintiff harm, but that the plaintiff is actually innocent of the crime charged. [126-129]

In a civil action in which the plaintiff alleged professional malpractice against his defense attorneys in a Federal criminal proceeding, the judge erred in granting summary judgment in favor of the attorneys, where the attorneys failed to establish that the plaintiff had no reasonable likelihood of establishing that he was actually innocent of the criminal charges, in that the question to be resolved (whether to credit the circumstantial evidence suggesting the plaintiff's guilt in the underlying Federal proceeding, or the evidence suggesting his innocence) was a factual one, properly delegated to a jury. [129-132]

Civil action commenced in the Superior Court Department on January 13, 2005.

The case was heard by *Christopher J. Muse,* J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Gregory R. Barison* for the plaintiff.

*Robert J. Murphy (Joel D. Hillygus* with him) for James H. Fagan & another.

*John P. Connell* for William A. Brown.

Cordy, J. In this lawsuit, the plaintiff, Humberto Correia, alleges professional malpractice against James H. Fagan and

[1]Fagan, Goldrick & Segadelli, P.C., and William A. Brown.

William A. Brown, his defense attorneys in a Federal criminal proceeding.[2] The claims arise out of the legal representation they provided Correia in that proceeding, which resulted in his conviction of arson, mail fraud, and the use of fire in the commission of a felony. The lawsuit was filed after Correia was granted a new trial in Federal court and acquitted of all of the criminal charges.

The question before us is whether Correia presented sufficient evidence on the issue of his actual innocence (an element of the malpractice claim) to survive the defendants' motions for summary judgment. A Superior Court judge concluded that he did not. We vacate the summary judgment for the defendants.

1. *The summary judgment record.* The evidence in the summary judgment record includes pleadings and judicial decisions from the first and second criminal trials, and the hearing on Correia's motion for a new trial. It also includes transcripts of selected testimony from each of those proceedings, as well as affidavits and deposition testimony, the relevant portions of which are described below.

a. *First trial.* On July 19, 2000, a Federal grand jury returned an indictment, charging Correia with one count of arson, three counts of mail fraud, and the use of fire in the commission of a felony. On July 20, Brown filed a notice of appearance on behalf of Correia, and on August 31, Fagan also filed a notice of appearance. Both attorneys represented Correia at a six-day jury trial in Federal court, which concluded on January 30, 2002, with convictions on all five counts of the indictment.

The evidence at the trial included the following. On September 30, 1996, a fire destroyed a commercial building located at 83 ½ Broadway in Taunton (property). Correia owned the two-story property, and operated a photograph processing business on the first floor. There were two apartments on the second floor; Correia used one as a "photo studio," and was in the process of renovating the other to rent to a friend in need of housing. The night before the fire, Correia was at the property with his son, painting that apartment.

On the morning of September 30, 1996, Correia arrived at

---

[2]Correia also brings his malpractice claim against Attorney James H. Fagan's law firm, Fagan, Goldrick & Segadelli, P.C.

the property at approximately 8:15 A.M. He unlocked the front door, disarmed the alarm system, and turned on the paper processor allowing it to warm up before he began work at 9 A.M. Then, consistent with his daily routine, Correia went to a neighboring coffee shop to purchase a coffee and a muffin, where he saw the shopowners, Michael and Robert George. Correia returned to the property, finished his muffin, and drove to a nearby hardware store. At 8:46 A.M., Correia purchased two drill bits and a pair of work gloves. He returned to the property, put on his gloves, and began to clean the weeds growing in the parking lot. After about ten minutes, Robert George (Robert) walked out to the parking lot to help a customer carry a large order of coffee and donuts to her car. Robert stopped to say hello to Correia, and as he looked toward the property he informed Correia that "there was steam coming out of [his] building." Correia looked up and realized that the steam Robert had identified was actually smoke. He ran to the front door, took two steps inside the building, and found that it was already full of smoke. Correia began to cough and retreated outside the building. Michael George telephoned 911. Fire department records show that the call was received at 9:04 A.M.

The Taunton fire department investigated the fire and concluded that it was "incendiary in origin." Although no accelerants were found, the fire investigator found a cardboard box filled with tissue paper in what he determined to be the epicenter of the fire. The box had been preserved because a ceiling tile had fallen on top of it. The investigator hypothesized that the burn area was filled with a number of similar boxes that were purposefully ignited and then destroyed in the fire. Additionally, the investigator concluded that Correia disarmed his fire alarm system, causing a delayed response by the fire department and much greater damage to the property. The State fire marshal investigated the fire and likewise concluded that Correia intentionally started it. The fire marshal offered a similar explanation: "[i]t was our belief that the box we had uncovered with tissue paper was one of many that contained the same items and were used to start the fire in the area of origin." The government also presented evidence of Correia's debts, suggesting a financial motive to set the fire and collect the insurance on the property.

Correia testified in his defense that he neither set fire to the property nor caused anyone to do so. When asked what caused the fire, he said, "I don't know."[3] He did, however, admit that he was the only one in the building on the morning of the fire.

b. *Motion for a new trial.* Following the jury verdict, defense counsel filed a motion for a new trial, asserting that there was insufficient evidence to support the convictions. Although the Federal judge concluded that the evidence was sufficient, she noted that the outcome of the trial "may nonetheless result in a miscarriage of justice, as [d]efendant may have been denied his Sixth Amendment right to the effective assistance of counsel." The judge, citing *United States* v. *Wilkerson,* 251 F.3d 273, 278 (1st Cir. 2001), ruled that she could, sua sponte, consider the effectiveness of counsel as a basis for granting a new trial, and she ordered the scheduling of an evidentiary hearing on the matter. She advised Correia to have new counsel file an appearance. Correia retained the services of Attorney Robert George,[4] who then represented him in the posttrial proceedings (and subsequently at his new trial).

The evidentiary hearing was held on May 17, 2002, and Fagan was the lone witness. He testified that he failed to hire an arson expert to investigate the crime and to attack the credibility of the government's witnesses, and that this decision unreasonably deprived Correia of an otherwise available ground of defense. Fagan also testified to his failure to present evidence that Correia did not have a fire alarm at his building, and that he could have called the individual who installed the alarm system, Manuel Franco, to testify that it was set up exclusively as a burglar alarm.[5] Fagan further testified about his failure to address

---

[3]Correia also speculated in his testimony that the fire was electrical in nature, but the record does not include any evidence to support this speculation. This may be attributed, at least in part, to Fagan's failure to hire an arson expert to investigate the cause of the fire and rebut the State and local investigations.

[4]Attorney Robert George is not the same Robert George who coowned the coffee shop.

[5]At that point in the hearing, the judge interjected that whether Correia had a fire alarm system "did not become clear to me during the trial. So even now, I'm not clear." Fagan candidly stated, "I think it underscores a significant failure on the part of defense counsel to illustrate that issue adequately to the jury, your Honor."

properly the issue of Correia's finances at trial. In particular, Fagan acknowledged that he could have presented a financial expert to demonstrate that Correia's debts were actually quite common — as they consisted mainly of mortgages on his home and business property — and that he had sufficient assets to pay both mortgages according to their terms.

The judge granted a new trial, concluding, "[b]ased on [her] own observations at trial and consequent knowledge of the facts of this case . . . that defense counsels' performance 'fell below an objective standard of reasonableness' and 'prejudiced the defense.' "[6] As support for this conclusion, the judge provided a roster of errors. She stressed defense counsels' failure to clarify that the defendant did not have a fire alarm at the property: "A crucial factual element of the government's case was that defendant shut off his fire alarm upon coming to work . . . . Had the jury heard . . . testimony that no such alarm had been installed, such a fact would have greatly undermined, if not disproved, the government's theory on the means by which the defendant undertook to burn down his business." She also found "defense counsels' . . . attempt to rebut the government's evidence on [the cause of the fire]" to be deficient and "counterproductive."[7]

In addition, the judge highlighted two other substantial errors. The first related to an arson investigation report prepared by the insurance company. After a "full arson investigation," Travelers Insurance Company (Travelers) paid the defendant's claim. This

---

[6]The judge succinctly described the government's case:

"At trial, the government could not, and did not, present any direct evidence that defendant set fire to his photo processing laboratory on that fateful Monday morning, in downtown Taunton, Massachusetts. Rather, the case against him was crafted from a patchwork of circumstantial evidence, largely unrebutted by the defense. According to the government, defendant arrived at his photo lab on September 30, 1996, with the intent to set fire to the building. The government's theory was that defendant was in financial straits and the fire became his 'exit strategy.' "

[7]Four government witnesses testified that the fire was not an electrical fire; defense counsel suggested otherwise, but failed to present any expert testimony to that effect, and failed to explore at trial a statement made by the Taunton fire investigator during his voir dire that the cause and origin of twenty per cent of all fires remain unknown.

was based on a report by John Tener, an attorney who supervised Travelers's arson investigation, and ultimately concluded that "the cause of the fire should be classified as undetermined." At trial, defense counsel unsuccessfully attempted to introduce the content of Tener's report into evidence during the cross-examination of James Hanrahan, the general adjuster for Travelers assigned to the defendant's claim. The judge pointed out that "[r]ather than present[ing] direct testimony from . . . Tener himself, defense counsel simply acquiesced to the [c]ourt's hearsay ruling," excluding Hanrahan's testimony about the report.

The second error related to Correia's purported financial motive to commit the crime. The judge found that the government introduced a "highly misleading chart . . . that depicted defendant's liabilities at over $270,000," without explaining the nature of those liabilities, or listing any assets that the defendant owned, and yet defense counsel failed to object to the chart, and failed to offer "any meaningful rebuttal."[8]

c. *The second trial.* After a new trial, Correia was acquitted by a jury of all of the charges against him. At that trial, Manuel Franco testified that he installed only a burglar alarm at Correia's property, and that the system was not equipped to detect fire or smoke. Tener also testified, stating that "there was insufficient evidence [of wrongdoing] for the Travelers to deny [Correia's] claim."[9] Tener noted that 9 A.M. would be "a somewhat unusual time" to "set [a] fire for profit," and that "it would be unlikely that [Correia] would have . . . set this fire in . . . broad daylight after shortly talking with someone nearby." Tener also testified that after a complete review of Correia's financial records, "there didn't appear to be an overriding financial motive" to set the fire.[10]

d. *Other evidence.* In addition to the evidence outlined above,

_____

[8]The government appealed from the Federal judge's grant of a new trial; the United States Court of Appeals for the First Circuit, in an unpublished opinion, affirmed the grant of a new trial.

[9]John Tener described the significance of this conclusion as follows: "I concluded that while there were questions about the claim, it would be difficult for the Travelers to deny the claim successfully and defend it if it had to in a court."

[10]Tener testified that Correia's "creditors considered him a good risk," any

and in further response to the defendants' motions for summary judgment, Correia offered Fagan's deposition testimony that Correia had rejected a plea bargain before the first trial because he maintained that he was innocent, and Correia's own deposition testimony,[11] in which he maintained that he was innocent of the alleged crimes, that he was not in financial trouble at the time, and that he did not have a fire alarm at the property. Correia did not offer any evidence discovered after the second trial that would further tend to prove his innocence. Nor did he offer evidence regarding who (other than himself) might have started the fire, or any expert or physical evidence to establish that the fire was not incendiary in origin.

2. *Summary judgment ruling.* In the malpractice case, the judge granted the defendants' motions for summary judgment, concluding that Correia was "unable, as a matter of law, to prove his actual innocence by a preponderance of the evidence." He based this conclusion entirely on what occurred at the second criminal trial: "[I]f the evidence presented at the Second Trial proved by a preponderance of the evidence that Correia was actually innocent of the charges against him, the [Federal] judge would likely have found that Correia . . . was entitled to judgment as a matter of law. Simply stated, if the evidence at the Second Trial was sufficient to prove actual innocence, the case would not have gone to the jury." The judge further concluded that because Correia failed to present any evidence, in opposition to the summary judgment motion, that was materially different from what was introduced at the second criminal trial, he "cannot, as a matter of law, prove by a preponderance of the evidence that he is innocent of the criminal charges that were filed against him." Correia appealed, and we transferred the case here on our own motion.

3. *Discussion.* a. *Elements of a criminal malpractice claim.*[12]

history of late payments was "not unusual," and he therefore probably did not have "an overriding financial motive" to set the fire.

[11]It is unclear whether Correia testified at the second trial. The Superior Court judge entered a procedural order directing Correia to deliver a copy of the trial transcript to the court, but Correia declined to do so, indicating that such a submission would cause a six- to eight-week delay in discovery, and would be quite costly.

[12]"The phrase 'criminal malpractice' has been widely adopted to denote 'legal malpractice in the course of defending a client accused of crime.' " *Ang*

A plaintiff seeking to prevail on a claim of legal malpractice must establish: (a) an attorney-client relationship, *DeVaux* v. *American Home Assur. Co.*, 387 Mass. 814, 817 (1983); out of which arose (b) a duty "to exercise a reasonable degree of care and skill in the performance of [the attorney's] legal duties," *Glidden* v. *Terranova*, 12 Mass. App. Ct. 597, 598 (1981); (c) a violation of that duty, *Fishman* v. *Brooks*, 396 Mass. 643, 646 (1986); and (d) "reasonably foreseeable loss [or damages] caused by [the attorney's] negligence," *id.* See generally G. Jacobs & K. Laurence, Professional Malpractice § 15.1 (2007).

When a plaintiff is a former criminal defendant claiming that his or her defense attorney negligently defended the plaintiff against a criminal charge, "[t]he causal requirement between the lawyer's negligence and damage then becomes twofold . . . ." R.E. Mallen & J.M. Smith, Legal Malpractice § 27:13, at 1040 (2008). The plaintiff "must prove by a preponderance of the evidence, not only that the negligence of the attorney defendant caused [the plaintiff] harm, but also that [the plaintiff] is innocent of the crime charged." *Glenn* v. *Aiken*, 409 Mass. 699, 707 (1991). See *Wiley* v. *County of San Diego*, 19 Cal. 4th 532, 545 (1998) ("in a criminal malpractice action actual innocence is a necessary element"). Thus, the attorney's negligence is not the cause of the "former client's injury as a matter of law, unless the plaintiff former client proves that he [or she] did not commit the crime." *Glenn* v. *Aiken*, *supra* at 702-703. See *Ang* v. *Martin*, 154 Wash. 2d 477, 485 (2005) ("Unless criminal malpractice plaintiffs can prove by a preponderance of the evidence their actual innocence, their own bad acts, not the alleged negligence of defense counsel, should be regarded as the cause in fact of their harm"); *Wiley* v. *County of San Diego*, *supra* at 539 ("Only an innocent person wrongly convicted due to inadequate representation has suffered a compensable injury because in that situation the nexus between malpractice and palpable harm is sufficient to warrant a civil action, however inadequate, to redress the loss").

This bifurcation of the cause element of a criminal malpractice

v. *Martin*, 154 Wash. 2d 477, 482 n.1 (2005), quoting Kaus & Mallen, The Misguiding Hand of Counsel — Reflections on "Criminal Malpractice," 21 UCLA L. Rev. 1191, 1191 n.2 (1974).

action is consistent with public policy. "A person who is guilty need not be compensated for what happened . . . as a result of [the] former attorney's negligence [as] [t]here is no reason to . . . reward[] [that person] indirectly for [the] crime." *Glenn* v. *Aiken, supra* at 707. See *Levine* v. *Kling*, 123 F.3d 580, 582 (7th Cir. 1997) ("Tort law provides damages only for harms to the plaintiff's legally protected interests . . . and the liberty of a guilty criminal is not one of them"); *Wiley* v. *County of San Diego, supra* at 538 (any subsequent negligent conduct by attorney is superseded by greater culpability of plaintiff's criminal conduct).[13]

Innocence, in this context, refers to "actual innocence, [and] not simply legal innocence." *Ang* v. *Martin, supra* at 484. "[B]ecause of the heavy burden of proof in a criminal case, an acquittal doesn't mean that the defendant did not commit the crime for which he [or she] was tried; all it means is that the government was not able to prove beyond a reasonable doubt that [the defendant] committed it." *Levine* v. *Kling, supra.* Consequently, in criminal malpractice cases, an acquittal alone will not "suffice as proof of innocence." *Moore* v. *Owens*, 298 Ill. App. 3d 672, 675 (1998). Instead, the plaintiff has the greater "burden of proving [by a preponderance of the evidence] that he [or she] was innocent of the [crimes] charged in the underlying criminal proceeding." *Glenn* v. *Aiken, supra* at 704. We are in the majority of States that require proof of actual innocence. See *Wiley* v. *County of San Diego, supra* at 536 ("clear majority of courts that have considered the question also require

[13]Thus, "[e]ven in cases where the causal link between an attorney's negligence and a client's erroneous imprisonment is most obvious (such as where the attorney fails to bring a clearly meritorious motion to suppress evidence that establishes guilt, which the [S]tate could not prove without it), civil recovery by a guilty plaintiff is not warranted" without proof of innocence. *Hicks* v. *Nunnery*, 253 Wis. 2d 721, 751 (Ct. App. 2002), citing *Wiley* v. *County of San Diego*, 19 Cal. 4th 532, 540 (1998). Central tenets of the criminal justice system, such as the State's burden to prove guilt beyond a reasonable doubt, the exclusionary rule, "and other constitutional protections are to safeguard against conviction of the wrongly accused and to vindicate fundamental values. They are not intended to confer any direct benefit outside the context of the criminal justice system. Thus, defense counsel's negligent failure to utilize them [without more] . . . does not give rise to civil liability." *Wiley* v. *County of San Diego, supra* at 541-542.

proof of actual innocence").[14,15]

b. *Summary judgment.* Summary judgment is appropriate
where there is no genuine issue as to any material fact and the
moving party is entitled to a judgment as a matter of law. Mass.
R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). See
*Lambert* v. *Fleet Nat'l Bank,* 449 Mass. 119, 122-123 (2007);
*Augat, Inc.* v. *Liberty Mut. Ins. Co.,* 410 Mass. 177, 120 (1991).
"[A] party moving for summary judgment in a case in which
the opposing party will have the burden of proof at trial is
entitled to summary judgment if [the moving party] demonstrates
. . . that the party opposing the motion has no reasonable
expectation of proving an essential element of that party's case."

---

[14]See also, e.g., *Schreiber* v. *Rowe,* 814 So. 2d 396, 399 (Fla. 2002) ("bet-
ter rule is to require a plaintiff" to prove that "he [or she] was innocent of the
crimes charged"); *Rodriguez* v. *Nielsen,* 264 Neb. 558, 561 (2002) (plaintiff
must "prove that he or she is innocent of the underlying crime"); *Mahoney* v.
*Shaheen, Cappiello, Stein & Gordon P.A.,* 143 N.H. 491, 496 (1999) (criminal
malpractice action will fail if claimant does not prove actual innocence by
preponderance of evidence); *Carmel* v. *Lunney,* 70 N.Y.2d 169, 173 (1987)
(plaintiff must assert and prove actual innocence); *Ang* v. *Martin, supra* at 485
("proving actual innocence" is essential element of criminal malpractice
claim); *Hicks* v. *Nunnery, supra* at 753-754 (plaintiff must convince civil jury
that he or she did not commit offenses of which plaintiff was convicted). Cf.
*Levine* v. *Kling,* 123 F.3d 580, 582 (7th Cir. 1997) (distinguishing "the case in
which the defendant is guilty in fact but has a sound legal defense, such as
double jeopardy, from a case in which he [or she] is both guilty in fact and
has no sound legal defense yet might, because of the heavy burden of proof
on the prosecution, have obtained an acquittal [with] a skillful lawyer. Only in
the second case is the malpractice suit . . . barred").

State courts do not universally require actual innocence as an element of a
criminal malpractice claim. See, e.g., *Rantz* v. *Kaufman,* 109 P.3d 132, 134-
135 (Colo. 2005) (requiring neither proof of actual innocence nor postconvic-
tion relief); *Godby* v. *Whitehead,* 837 N.E.2d 146, 151 (Ind. Ct. App. 2005)
(same). The Restatement likewise does not require proof of actual innocence:
"Although most jurisdictions addressing the issue have stricter rules, under
this Section it is not necessary to prove that the convicted defendant was in
fact innocent." Restatement (Third) of the Law Governing Lawyers § 53
comment d, at 392 (2000).

[15]Many States also require a "postconviction exoneration [as] a prerequisite
to prevailing on a [criminal] malpractice claim." *Coscia* v. *McKenna & Cu-
neo,* 25 Cal. 4th 1194, 1198 (2001). We have not had an occasion to address
the issue, and because it is undisputed that Correia was granted a new trial on
the ground that defendants Fagan and Brown had provided ineffective as-
sistance of counsel, and was acquitted at his second trial, the issue is not
presented here.

*Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). We review the material evidence in the light most favorable to Correia, *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, *supra*, to determine whether the defendants satisfied their "burden of demonstrating the absence of triable issues . . . by establishing that [Correia] will not be able to prove an essential element of [his] case" (citations omitted). *Standerwick* v. *Zoning Bd. of Appeals of Andover*, 447 Mass. 20, 32 (2006).

As noted above, the judge granted summary judgment to the defendants, reasoning, essentially, that because the Federal judge did not grant Correia's Fed. R. Crim. P. 29 (a) motion for a judgment of acquittal[16] before the government's case was submitted to the jury at the second trial (on substantially the same evidentiary record), Correia was precluded, as a matter of law, from establishing actual innocence.[17]

"Under Rule 29, a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could [find] the defendant guilty beyond a reasonable doubt." *United States* v. *Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). The rule also permits the Federal judge to "reserve decision on the motion . . . submit the case to the jury, and decide the motion . . . after [the jury

---

[16]Rule 29 (a) of the Federal Rules of Criminal Procedure provides, in relevant part: "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. . . ."

[17]The judge also relied heavily on *Tibor* v. *Superior Court*, 52 Cal. App. 4th 1359, 1373 (1997) (*Tibor*), which held that "the question of factual innocence is wholly one for the trial court and not for the jury." He quoted at length from *Tibor*, including the following passage: "The court [is] required to make a finding, as a matter of law, as to the issue of factual innocence. Should the court find that a reasonable cause exists to believe that the plaintiff committed the offense for which the arrest was made, the court would be required to grant the [attorney's] motion for summary judgment since such a finding, in effect, means that the plaintiff cannot, as a matter of law, prove by a preponderance of the evidence that he is innocent of the criminal charges . . . ."

*Tibor* has been expressly limited to its facts by *Salisbury* v. *County of Orange*, 131 Cal. App. 4th 756, 766 (2005): "*Tibor* must be limited to a summary judgment motion where there is no triable issue of fact on actual innocence; any other reading of *Tibor* would contravene a malpractice plaintiff's right to a jury trial." Thus, the *Salisbury* court held that where actual innocence is reasonably in dispute, the issue must be decided by the jury. *Id.*

return] a verdict of guilty." Fed. R. Crim. P. 29 (b). There is no indication in the record that the Federal judge actually denied (rather than reserved decision on) Correia's rule 29 (a) motion for acquittal when it was filed, and of course, if it was reserved, the judge would not have had occasion to decide the motion once Correia had been acquitted by the jury. Regardless, a decision in the criminal context that a rational jury could find Correia guilty beyond a reasonable doubt does not preclude him from later establishing by a preponderance of the evidence, in the civil context, that he was innocent of the underlying charges.[18]

The government's evidence regarding Correia's role in the setting of the fire was, as the Federal judge described it, a "patchwork of circumstantial evidence" that, as is apparent from the evidence at the second trial, was largely based on two highly disputable premises: first, that Correia was suffering from severe financial woes and set the fire to recover insurance money; and, second, that Correia purposefully disarmed his fire alarm, resulting in much greater damage to the property. The testimony of defense witnesses at the second trial seriously questioned, if not flatly refuted, both premises. In addition, Correia testified at the first trial and at his deposition in this proceeding that he played no role in setting the fire.

---

[18]This is particularly so where the outcome depends on which witnesses the jury find more credible. Ordinarily a motion pursuant to Fed. R. Crim. P. 29 (a) will not be granted if there is conflicting testimony from witnesses as to guilt, and the outcome depends on the jury's evaluation of the credibility of their testimony. See *United States* v. *Doe*, 921 F.2d 340, 346 (1st Cir. 1990), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979) ("it is the responsibility of the jury 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences' "). See also *Burks* v. *United States*, 437 U.S. 1, 16 (1978) ("Even the trial court, which has heard the testimony of witnesses firsthand, is not to weigh the evidence or assess the credibility of witnesses when it judges the merits of a motion for acquittal"); *United States* v. *Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) ("Courts must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury"). See generally 2A C.A. Wright, N.J. King, S.R. Klein, & P.J. Henning, Federal Practice and Procedure § 467 (3d ed. Supp. 2008). In such circumstances, the jury may find that the defendant's witnesses are more credible, and on that basis conclude that the government has not proved guilt beyond a reasonable doubt. Such a conclusion would be perfectly consistent with the finding of a subsequent civil jury that those same witnesses establish the defendant's innocence by a preponderance of the evidence.

In this posture, the question to be resolved is whether to credit the circumstantial evidence suggesting Correia's guilt, or the evidence suggesting his innocence. That determination is a "factual one, properly delegated to the jury . . . rather than being decided by a judge . . . based on the judge's impression of how guilty or innocent the plaintiff appears to be." *Hicks* v. *Nunnery*, 253 Wis. 2d 721, 755 (Ct. App. 2002).[19] Where questions of triable fact remain, "the determination of actual innocence is rooted in the goal of reliable factfinding," best left to the jury. *Salisbury* v. *County of Orange*, 131 Cal. App. 4th 756, 765 (2005).

4. *Conclusion.* Because we conclude that the defendants have failed to establish that Correia has no reasonable likelihood of establishing that he was actually innocent of the criminal charges, we vacate the allowance of their motions for summary judgment. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[19]"We emphasize that the question of a plaintiff's innocence is in addition to, not a substitute for, a jury question regarding whether the plaintiff would have been found not guilty absent the defendant's negligence. A defendant's negligence must be found to be a cause-in-fact of the plaintiff's harm, and in the present context, this means that the attorney's negligence must still be found to have been a substantial factor contributing to the plaintiff's conviction." *Hicks* v. *Nunnery*, 253 Wis. 2d 721, 755 (Ct. App. 2002).