# United States Court of Appeals
## For the First Circuit

No. 11-2475

BOSTON PROPERTY EXCHANGE TRANSFER COMPANY,
f/k/a Benistar Property Exchange Trust Company, Inc.,

Plaintiff, Appellant,

v.

JOSEPH IANTOSCA, individually and as a Trustee of Faxon Heights
Apartments Realty Trust and Fern Realty Trust; BELRIDGE
CORPORATION; GAIL A. CAHALY; JEFFREY M. JOHNSTON; BELLEMORE
ASSOCIATES, LLC; MASSACHUSETTS LUMBER COMPANY, INC.; ZELLE
McDONOUGH & COHEN LLP; ANTHONY R. ZELLE, P.C.; and NYSTROM,
BECKMAN & PARIS, LLP,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter,[*] Associate Justice,
and Selya, Circuit Judge.

Joseph M. Pastore III with whom Smith, Gambrell & Russell,
LLP, Sean T. Carnathan and O'Connor, Carnathan, & Mack LLC were on
brief for appellant.
Anthony R. Zelle with whom Thomas W. Evans and Zelle McDonough
& Cohen, LLP were on brief for appellees Joseph Iantosca,
individually and as Trustee of Faxon Heights Apartments Realty
Trust and Fern Realty Trust, Belridge Corporation, Gail A. Cahaly,
Jeffrey M. Johnston, Bellemore Associates, LLC, and Massachusetts
Lumber Company, Inc.

---

[*]The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

Timothy O. Egan with whom George A. Berman, Timothy M. Pomarole and Peabody & Arnold LLP were on brief for appellees Zelle McDonough & Cohen LLP, Anthony R. Zelle, P.C., and Nystrom Beckman & Paris LLP.

————————————————

June 12, 2013

————————————————

**SOUTER, Associate Justice.** As plaintiffs in a prior suit, several of the defendant-appellees here (the defendants) obtained a state court judgment for $19.2 million against the plaintiff-appellant here, Boston Property Exchange Transfer Company (BPE), formerly Benistar Property Exchange Trust Company. In order to satisfy that judgment, the successful, present defendants obtained an order from the state court assigning to them BPE's related arbitration claims against PaineWebber. In this federal action, BPE claims damages from the defendant assignees and their lawyers for mishandling the PaineWebber arbitration. The district court dismissed all of BPE's claims, either on a motion to dismiss or on summary judgment. We affirm.

I.

This is the latest of over a decade of state and federal cases arising out of the financial misconduct of BPE and its owner Daniel Carpenter.[1] In what the parties refer to as the Cahaly litigation, the following evidence led to findings that BPE, Carpenter, and other defendants were liable for various forms of financial misconduct. See generally Cahaly v. Benistar Prop. Exch.

---

[1] See, e.g., Iantosca v. Step Plan Servs., Inc., 604 F.3d 24 (1st Cir. 2010); United States v. Carpenter, 494 F.3d 13 (1st Cir. 2007), cert. denied, 552 U.S. 1230 (2008); United States v. Carpenter, 405 F. Supp. 2d 85 (D. Mass. 2005); Cahaly v. Benistar Prop. Exch. Trust Co., 885 N.E.2d 800 (Mass.), cert. denied, 555 U.S. 1047 (2008); Cahaly v. Benistar Prop. Exch. Trust Co., 864 N.E.2d 548 (Mass. App. Ct. 2007); Cahaly v. Benistar Prop. Exch. Trust Co., 2003 WL 21246167 (Mass. Super. Ct. Feb. 25, 2003).

Trust Co., 864 N.E.2d 548, 552-53, 559-60 (Mass. App. Ct. 2007); Cahaly v. Benistar Prop. Exch. Trust Co., 885 N.E.2d 800, 807-09 (Mass.), cert. denied, 555 U.S. 1047 (2008). BPE was a financial intermediary for "like-kind" property exchanges under section 1031 of the federal tax code, which allows a property owner to avoid recognizing capital gains from a sale by using the proceeds to purchase a similar or "like-kind" property within 180 days. The seller must lodge the proceeds from the sale with a qualified intermediary (or one of several other regulatory safe harbors) until the funds are used to buy the replacement property. See 26 C.F.R. § 1.1031(k)-1(g).

The Cahaly plaintiffs, who are among the defendants in this case, were six individuals or companies that used BPE when engaging in like-kind exchanges.[2] BPE held their funds under agreements providing that the monies would be available on demand, prior to which they would be held in escrow accounts, either a "money market" account earning three percent interest or an "investment" account earning six percent.

In 1998, Carpenter opened trading accounts for such funds at Merrill Lynch, superseded in 2000 by new accounts at

---

[2] The plaintiffs in Cahaly, all of whom are defendant-appellees in this case, were Gail A. Cahaly; Jeffrey M. Johnston; Bellemore Associates, LLC; Massachusetts Lumber Company, Inc.; Joseph Iantosca, individually and as trustee of the Faxon Heights Apartments Realty Trust and Fern Realty Trust; and Belridge Corporation. Cahaly, 864 N.E.2d at 548 n.1.

PaineWebber.  Contrary to the escrow agreements, Carpenter engaged in aggressive and high-volume trading of options on technology stocks, rendered the more risky by margin funding with money borrowed from the brokerage houses.  Although the trading was successful for a time, Carpenter began to lose money quickly when technology stocks fell sharply in 2000, the consequences being that BPE was unable to return the exchangors' funds as required, and ultimately lost about $8.6 million of their money.

BPE was found liable for (inter alia) conversion, breach of contract, breach of fiduciary duty, intentional misrepresentation, and violation of the Massachusetts consumer protection statute, Mass. Gen. Laws ch. 93A.[3]  These judgments were upheld on appeal by the Massachusetts Appeals Court and the Supreme Judicial Court of Massachusetts, Cahaly, 864 N.E.2d at 559-60; Cahaly, 885 N.E.2d at 822, and the Cahaly plaintiffs obtained a final judgment against BPE of some $19.2 million, including punitive damages, interest, attorneys' fees, and costs.

At the time of that judgment, BPE was about to begin arbitration of claims against PaineWebber, which it charged with

---

[3] The trial judge granted summary judgment for the Cahaly plaintiffs on their breach of contract and conversion claims.  The plaintiffs then prevailed at a jury trial on their fiduciary duty and misrepresentation claims, along with claims under New York and Connecticut consumer protection statutes.  In a subsequent bench trial, the trial judge found for the plaintiffs on the Chapter 93A claim.  The plaintiffs also prevailed on certain causes of action against other defendants, including Carpenter, though only the judgment against BPE is directly relevant here.

responsibility for its debacle, as described further below.  The Cahaly plaintiffs filed a motion with the Superior Court to compel assignment of BPE's legal claims to them to help satisfy their judgment against BPE, a move BPE strenuously opposed.  Then-Superior Court Judge Botsford (who presided over the Cahaly trials) granted the motion in the following assignment order:

> After hearing, and pursuant to G. L. c. 223A, § 86A, and c. 214, § 3(6), it is Ordered that Benistar Property Exchange Trust Company, Inc.'s legal claims against UBS PaineWebber, Inc. (PaineWebber) be assigned for prosecution to the plaintiffs in this action.  Any action that the plaintiffs, as assignees, may take with respect to the pending NASD proceedings is a matter for the arbitrators to decide, not this court.  Any damages that may be awarded to Benistar Property against PaineWebber are to be held in escrow by the plaintiffs (through their counsel) pending further order of this Court.

Thereupon, the Cahaly plaintiffs and their lawyers (who are also defendants here) took control of the arbitration against PaineWebber.  They promptly replaced BPE's statement of claim with an amended claim based on a completely new theory of liability. BPE says here that in doing this, the defendants "hijacked" the arbitration claims in a way that violated their legal duties as assignees and attorneys.

Each theory, of course, starts with PaineWebber's relationship with BPE through the brokerage accounts already mentioned, which extended from October 2000 through January 2001. As technology stocks declined in this period, BPE's losses rose to

$4 million in November and $5.5 million by December 18. PaineWebber eventually decided to cut its losses from the margin transactions by forcing BPE to close its accounts and liquidate its trading positions in December 2000 and early January 2001. The crux of BPE's original arbitration claim was that PaineWebber caused BPE's own losses by forcing it to stop trading: if PaineWebber had allowed BPE to continue trading, BPE would allegedly have benefitted from a market rally in late December 2000 and January 2001 that could have erased the losses. BPE argued that PaineWebber bore responsibility not just for losing the $8.6 million, but for the Cahaly plaintiffs' entire judgment against BPE, which it then estimated at about $20.5 million. BPE sought indemnification for the Cahaly judgment, contribution for costs and attorneys' fees related to the Cahaly litigation, and compensation for other funds that it said PaineWebber withheld wrongfully from BPE. In total, BPE requested compensatory damages of $29.5 million, along with punitive damages of $58.9 million, which would treble the award sought to $88.4 million.

From the start, BPE and the state court judge knew that the Cahaly plaintiffs derided this position. One basis of their argument for assignment was that BPE's proposed theory of recovery was "meritless" and that the arbitration panel would "certainly never find PaineWebber liable for stopping Carpenter from continuing to illegally trade the plaintiffs' depository funds."

Once the assignment was ordered, the Cahaly plaintiffs substituted an amended statement of claim based on the theory that PaineWebber never should have allowed Carpenter and BPE to speculate in technology stock options with what it knew or should have known were escrowed property exchange funds. The Cahaly plaintiffs also charged that PaineWebber committed professional malpractice in brokering unsuitable speculative trades for BPE, and they contended that the broker's failure to discern the nature of BPE's business and stop the trading earlier constituted negligence and breach of fiduciary duties, among other claims. The amended claim was stated at $8.6 million in compensatory damages plus attorneys' fees, costs, and an unspecified punitive amount.

The arbitration panel ruled for BPE on the basis of the amended theory, with an award of $8.7 million in compensatory damages along with interest and attorneys' fees, for a total of $12.7 million, but with no punitive damages. The panel gave no explanation for its decision. In accordance with the assignment order, the award went to the Cahaly plaintiffs toward satisfaction of their judgment against BPE, but because the amount was less than the judgment, BPE received nothing.

II.

On December 12, 2008, BPE filed this complaint against the Cahaly plaintiffs and their lawyers,[4] the Iantosca defendants and the attorney defendants, in federal district court, citing diversity jurisdiction. As amended, the complaint claimed negligence, breach of the attorney-client duty of care, and breach of fiduciary duty against the attorney defendants (Counts I-III); negligence, breach of fiduciary duty, and breach of contract against the Iantosca defendants (Counts IV-VI); and violation of Mass. Gen. Laws ch. 93A and the Connecticut Unfair Trade Practices Act (CUTPA) against all defendants (Counts VII and VIII).

Under each theory, the dereliction alleged was the same: that the defendants committed these violations by jettisoning BPE's claim in the PaineWebber arbitration in favor of the new one. Because the arbitration produced $12.6 million, not the $88 million sought under the discarded theory, BPE asked for the entire

---

[4] The lawyers are Anthony R. Zelle's personal corporation and two law firms: Zelle McDonough & Cohen, LLP, and Nystrom Beckman & Paris LLP. These defendants represented the Iantosca defendants when they were plaintiffs in the Cahaly litigation and claimants in the PaineWebber arbitration. Zelle and his firm continue to represent the Iantosca defendants in this appeal.

difference of $75.4 million,[5] along with punitive damages of $226.2 million.

In response to the defendants' motions, the district court dismissed some claims but left others intact. See Bos. Prop. Exch. Transfer Co. v. Iantosca, 686 F. Supp. 2d 138 (D. Mass. 2010). It dismissed all claims against the attorney defendants, holding that the lawyers owed no duty to BPE in conducting the PaineWebber arbitration because of a potential conflict of interest between BPE and their clients, the Iantosca defendants, id. at 142-43; and thus BPE had failed to state a claim against the attorney defendants for violation of Chapter 93A or CUTPA, id. at 145. The district court dismissed the CUTPA claim against the Iantosca defendants, but declined to dismiss the others. Id. at 143-45.

Following the dismissal order, the attorney defendants moved for entry of partial final judgment in their favor on all claims against them, as allowed under Fed. R. Civ. P. 54(b). The district court signed the bottom of the first page of their motion: "Motion allowed," and the ensuing entry in the docket report read, "Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 46 Motion for Entry of Judgment under Rule 54(b) . . . (Entered:

_____

[5] Although the award rounds to $12.7 million, BPE consistently refers to the award as $12.6 million. In its complaint, BPE also stated that it sought $88 million in the PaineWebber arbitration, rather than the actual $88.4 million. It used these amounts to calculate its sought-after compensatory award of $75.4 million. We will occasionally repeat these rounding errors when discussing BPE's claims, but they have no impact on the substance of the case.

-10-

06/10/2010)."  The district court did not produce a separate document signifying that a judgment had been entered, nor did the court make any findings to support granting the motion.

Discovery continued for the remaining claims against the Iantosca defendants, and both sides filed motions for summary judgment.  BPE's was denied, and the Iantosca defendants' was granted as to all remaining claims.  See Bos. Prop. Exch. Transfer Co. v. Iantosca, 834 F. Supp. 2d 4 (D. Mass. 2011).  The district court held that the Superior Court's assignment order was not a contract, and that it imposed no duty to prosecute BPE's arbitration claim on its original theory.  Id. at 8-9.  BPE's Chapter 93A claim was discarded for failure to show that the defendants exceeded the scope of the assignment order or acted in an unfair or deceptive manner.  Id. at 10.

### III.

Preceding the merits issues, there is a question about our appellate jurisdiction over the attorney defendants.  They argue that BPE's appeal was untimely as to them because the district court's endorsement of their Rule 54(b) motion ripened into a final judgment for which the appeal period ran out before BPE filed its notice of appeal.  This objection is not well taken.

Under Fed. R. App. P. 4(a)(1)(A), a notice of appeal generally must be filed within thirty days of the "entry of the judgment or order appealed from."  See also Budinich v. Becton

<u>Dickinson & Co.</u>, 486 U.S. 196, 203 (1988) (time limit is "mandatory and jurisdictional").  Typically, under 28 U.S.C. § 1291, there is an appealable judgment only when the district court issues an order that disposes of all claims against all parties (with some exceptions not pertinent here), "leav[ing] nothing for the court to do but execute the judgment."  <u>Catlin</u> v. <u>United States</u>, 324 U.S. 229, 233 (1945).  Rule 54(b) of the Federal Rules of Civil Procedure provides for an exception, however, under which a district court can enter partial final judgment related to a subset of the claims or parties involved, but "only if the court expressly determines that there is no just reason for delay."

The attorney defendants say that the district court's "endorsed order" signed on a page of their Rule 54(b) motion is a final judgment as to the claims against them.  And although a judgment customarily requires entry of a separate document in the civil docket, Fed. R. Civ. P. 58(a), under Fed. R. Civ. P. 58(c)(2)(B), judgment enters after 150 days have passed since a judgment order was placed on the civil docket, even if no separate document was filed.  The attorney defendants therefore argue that judgment in their favor entered 150 days after the endorsed order, in November 2010, making this appeal untimely as to them, having been filed more than a year later on December 12, 2011.

This argument misses the mark, because Rule 58(c) details when a judgment has entered, if timing is the only question, but it

does not address whether a judgment has entered, when the issue implicates more than timing. The jurisdictional question here is in the latter category, and to determine whether the endorsed order was a judgment, it is Rule 54(b) that controls. By its terms the endorsed order was not a judgment; thus, judgment in favor of the attorney defendants did not become final until the district court's summary judgment order disposed of the remaining claims.

Rule 54(b) reads this way:

> **Judgment on Multiple Claims or Involving Multiple Parties.** When an action presents more than one claim for relief--whether as a claim, counterclaim, crossclaim, or third-party claim--or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities. (emphasis added)

As the Supreme Court has put it, a district court entering a Rule 54(b) judgment must go through two steps: it must "determine that it is dealing with a 'final judgment'" that provides an ultimate disposition on a "cognizable claim for relief," and it must "determine whether there is any just reason for delay." Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 7-

-13-

8 (1980); accord Willhauck v. Halpin, 953 F.2d 689, 701 (1st Cir. 1991). This court has said that in most cases, some concise findings "will likely be needed" to explain why there is no just reason for delay, Spiegel v. Trs. of Tufts Coll., 843 F.2d 38, 43 n.4 (1st Cir. 1988), and in simply signing his name to the attorney defendants' motion, the district judge made no such findings. That would be the end of the matter, save for the fact that in at least two cases we have relaxed the usual requirement of Rule 54(b) findings in order to hear an appeal immediately in the interests of justice. See Quinn v. City of Boston, 325 F.3d 18, 26-27 (1st Cir. 2003); Feinstein v. Resolution Trust Corp., 942 F.2d 34, 39-40 (1st Cir. 1991).

The attorney defendants here ask for similar relaxation of the black-letter findings requirement, but careful attention to their circumstances fails to show why they should have it. Rule 54(b) can prove pivotal to the question of appellate jurisdiction in two situations. In the first, the district court disposes of a subset of the claims, and the appellant attempts to appeal the order immediately. In that situation, a valid Rule 54(b) determination of no just reason for delay would provide the appellate court with jurisdiction, and a tolerance for arguably inadequate findings would do the same. By contrast, as in this case, Rule 54(b) can also be invoked to deprive an appellate court of jurisdiction, when a district court disposes of the subset and

-14-

the losing party waits until the conclusion of litigation to appeal. The appellee then argues that the appeal is untimely as to the claims that were disposed of earlier because the appellant did not appeal within 30 days of the purported Rule 54(b) order.

Our prior cases treating the requirement for a Rule 54(b) finding as malleable have rested on conclusions that either the public or predominant equitable interest weighed in favor of adjudicating those appeals. See Quinn, 325 F.3d at 27 ("The most important factor counseling in favor of allowing an immediate appeal in this case is the public interest. . . . In short, the nature of the issue calls out for immediate resolution."); Feinstein, 942 F.2d at 40 ("A weighing of the factors relevant to the use of Rule 54(b) tilts sharply in favor of allowing the appeals to go forward." (citation omitted)).[6] While we do not hold that the rigor of Rule 54(b) is diminished only when the result would be to entertain an immediate appeal, here we know of no

---

[6] Other circuits likewise have occasionally relaxed the Rule 54(b) requirements when doing so would allow the court to hear an immediate appeal. See, e.g., St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 693 (2d Cir. 1989) ("[W]e have recognized an exception to Rule 54(b)'s requirements where the question of whether a Rule 54(b) certificate was improvidently granted is a close one, [and therefore] we may decline to dismiss the appeal chiefly because we believe that our disposition of the appeal . . . will make possible a more expeditious and just result for all parties." (second and third alterations in original) (internal quotation marks omitted)); Akers v. Alvey, 338 F.3d 491, 495 (6th Cir. 2003) ("Because this case has already been briefed and argued on appeal, however, the scales of judicial economy are now tipped in favor of disposing of the appeal on the merits.").

public interest or other equitable argument for relaxation of the usual requirement of findings. For want of them, therefore, the endorsed order did not qualify as a final judgment under Rule 54(b), the time did not run from the endorsement, and the appeal is timely now as to all defendants.

IV.

There is one more issue enough in need of attention at the threshold that we raise it ourselves, though we do not resolve it. We are puzzled that this lawsuit ever ended up in federal court or remained in the federal forum as long as it has. BPE claims injury mainly under Massachusetts law. Its claim has no merit if the defendants' action was authorized by the terms of the state court assignment and that assignment was properly ordered under state law. The parties were in litigation before the Massachusetts state courts, and BPE has provided no convincing explanation for its failure to seek resolution there of the scope and propriety of the assignment order and the defendants' conformity to it, instead waiting years to pursue these matters in federal court.

Specifically, BPE argues that when the defendants amended BPE's arbitration claim against PaineWebber, they violated the assignment order and breached various state law duties incumbent on them as assignees and their lawyers. At the time of the disputed amendment in July 2005, BPE and the defendants in this lawsuit were

engaged in the Cahaly litigation before the Massachusetts state courts. BPE conceded at oral argument (as it surely had to) that it could have complained at the time to the Superior Court judge who issued the assignment order, Judge Botsford. Judge Botsford could have elucidated the scope of the assignment order and the state law duties that arose from that order. If she had ruled for the present defendants, we would not be hearing argument now. If she had ruled in BPE's favor, she would have been able to change the course of the PaineWebber arbitration before it was too late. But BPE did not complain to Judge Botsford. Instead, it passed up any opportunity for a remedy in the Superior Court at the time of the assignment order and at the time the claim was amended. And after the arbitration panel produced an award that BPE thought was insufficient, BPE waited nearly three years and then brought a new lawsuit in federal court, turning on issues that could have been appropriately resolved in the underlying state litigation but were not pursued.

It is beside the point that Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), requires federal courts exercising diversity jurisdiction to pronounce on questions of state common law, for the issue posed by this situation is not how questions of state law should be answered, but when those questions should be raised. When federal parties have already been before a state court, and the federal plaintiff had and passed up an opportunity

for the state court to resolve state law issues, why should its failure to avail itself of state court remedies diligently not be treated in federal court as a waiver of those claims?[7]

Although a strong argument thus exists that BPE waived state law claims tantamount to this entire lawsuit, at no point in the district court or on appeal have the defendants raised the waiver issue or suggested that this dispute does not belong in federal court. We broached the issue sua sponte at oral argument, but counsel for each side seemed unprepared to offer developed

---

[7] Other federal courts have declined to adjudicate claims in analogous circumstances. For example, in Snyder v. Office of Personnel Management, 136 F.3d 1474 (Fed. Cir. 1998), the Federal Circuit rejected an argument that a Texas state court's divorce decree was invalid and unconstitutional. The OPM had relied on the decree to award a portion of the petitioner's civil service pension to his ex-wife. Id. at 1477. The Federal Circuit declined to hear the collateral challenge to the state court order because that challenge should have been brought in state court. Id. at 1479; accord Adler v. Office of Personnel Mgmt., 437 Fed. App'x 928, 931 (Fed. Cir. 2011) ("The proper forum for a constitutional challenge to the Wisconsin Order is a Wisconsin state court.").

Similarly, in Allstate Insurance Co. v. West Virginia State Bar, 233 F.3d 813 (4th Cir. 2000), the Fourth Circuit refused to hear an attack on a state administrative proceeding that could have been brought in the state court. A West Virginia state legal disciplinary tribunal had ruled against Allstate for engaging in the unauthorized practice of law, and Allstate subsequently brought a federal complaint challenging the adverse ruling. Id. at 815. The Fourth Circuit refused to hear a constitutional challenge that Allstate failed to raise in the state court, noting, "[b]y failing to raise his claims in state court a plaintiff may forfeit his right to obtain review of the state court decision in any federal court." Id. at 819 (citing D.C. Court of Appeals v. Feldman, 460 U.S. 462, 484 n.16 (1983)).

Though not perfectly on point, these cases provide some support for the notion that once the parties were in state court, it was only there that BPE had the opportunity to raise claims related to the assignment order.

-18-

argument on the matter.  Because it was the defendants' burden to raise this issue, and they have not done so, it may be unfair to deny BPE's claim on a ground that was not stated until appellate oral argument and to which BPE was not warned to respond or asked to address after argument.  We will therefore go no further here than to caution counsel in future cases about the risk of resorting to diversity jurisdiction as a substitute for a foregone opportunity in underlying state court litigation between the same parties.

V.

Addressing the merits, we start with BPE's appeal of the summary judgment in favor of the Iantosca defendants, which we examine de novo, viewing the facts and drawing all reasonable inferences in favor of the nonmoving party (in this case, BPE), Rared Manchester NH, LLC v. Rite Aid of N.H., Inc., 693 F.3d 48, 52 (1st Cir. 2012), and affirming only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  But because we may affirm on any basis apparent from the record, Hoyos v. Telecorp Commc'ns, Inc., 488 F.3d 1, 5 (1st Cir. 2007), it is unnecessary to reach any of the many difficult state law issues about the existence and scope of various duties raised by BPE's claims on appeal.

As for the tort claims, we affirm summary judgment for the defendants on all of them because BPE failed to provide any

-19-

evidence to meet an essential element of each: that the defendants caused it to suffer damages.[8]  Every one of these causes of action required BPE to prove that the defendants' revision of the arbitration claim left BPE worse off financially by some ascertainable amount than would have been the case if BPE's own theory of recovery had been pursued.  Courts sometimes list the requirement as a single element and sometimes list causation and damages separately, but the substance is the same: the plaintiff must show that the defendant's allegedly tortious conduct put the plaintiff in a worse position than he would have been in but for the misdeed.

BPE says that the defendants harmed it by substituting an amended arbitration claim for its original, but the amended claim produced an award of $12.6 million.  Thus, to prove causation of damages, BPE would need to show that it would have recovered more than $12.6 million on its original theory.  Cf. Fishman v. Brooks, 487 N.E.2d 1377, 1380 (Mass. 1986) ("A plaintiff who claims that his attorney was negligent in the prosecution of a tort claim will

---

[8] See Donovan v. Philip Morris USA, Inc., 914 N.E.2d 891, 898-99 (Mass. 2009) (negligence); Correia v. Fagan, 891 N.E.2d 227, 232 (Mass. 2008) (legal malpractice); Hanover Ins. Co. v. Sutton, 705 N.E.2d 279, 288 (Mass. App. Ct. 1999) (breach of fiduciary duty); Weeks v. Harbor Nat'l Bank, 445 N.E.2d 605, 607 n.2 (Mass. 1983) (Chapter 93A); Stevenson Lumber Company-Suffield, Inc. v. Chase Assocs., Inc., 932 A.2d 401, 406 (Conn. 2007) (CUTPA); cf. Ankiewicz v. Kinder, 563 N.E.2d 684, 686 (Mass. 1990) ("All torts share the elements of duty, breach of that duty, and damages arising from that breach.").

prevail if he proves that he probably would have obtained a better result had the attorney exercised adequate skill and care."). This means that in an action based on alleged mishandling of a legal damage claim, such as legal malpractice, it is essential to establish the likelihood of a better result had the proceeding been different from the defendant's chosen course.

Here, BPE failed to put forward any evidence that its original arbitration theory against PaineWebber had any reasonable chance of leading to a recovery of more than $12.6 million. Indeed, the district court and appellate record is notable for the total absence of any discussion by BPE of the merits of its original claim, and the witness who spoke for BPE as much as admitted that he had no evidentiary basis for such a contention, in the following deposition testimony:

> Q  Do you have any facts or information that would support the contention that the arbitration panel would have awarded more than it did to [BPE] if [the defendants] had not amended [the] statement of claim?
>
> A  The only fact or information I have on that is the fact that they didn't award more, because the statement of claim was amended.

The Iantosca defendants clearly raised this issue in their memorandum in support of summary judgment. It elicited nothing more by way of response than the facts that the defendants amended the arbitration claim, and the amended claim produced $8.7 million in compensatory damages, or $12.6 million in total. It

should be unnecessary to point out that an award of $12.6 million on the amended claim indicates nothing about what the claim as originally stated would have produced.

This hole in BPE's evidentiary proffer would support the judgment in any case, but is all the more striking owing to the evidently fanciful character of BPE's original theory of tortious conduct. In the Cahaly litigation, the judge and jury found that BPE committed (inter alia) breach of contract, conversion, and breach of fiduciary duty by speculating in technology stock options with clients' escrowed funds. Yet BPE's original arbitration position was that PaineWebber should be held liable for refusing to let BPE continue its proven unlawful trading. Not only that, but because PaineWebber financed the trading by providing BPE with "large amounts of margin debt," PaineWebber would have had to continue to put its own money at risk to support unlawful conduct that was piling up rapid losses.[9] A finding of liability in

_____

[9] Yet another reason exists to doubt the potential of BPE's original theory. BPE claimed that if it had been allowed to trade technology stock options for longer, it could have recovered its losses in a subsequent stock market rally. But the rally proved short-lived. We take judicial notice that from December 20, 2000, through January 24, 2001, the NASDAQ Composite Index (a leading index of technology stocks) rose from 2332.78 to 2859.15, a jump of 22.6%; yet the index then suffered a further plunge, dropping to 1638.8 on April 4, 2001; to 1423.19 on September 21, 2001; and to 1114.11 on October 9, 2002 (a drop of 61.0% from the January 2001 peak). See Yahoo! Finance, NASDAQ Composite Stock, http://finance.yahoo.com/q/hp?s=%5EIXIC+Historical+Prices (last visited May 31, 2013). BPE's original theory thus depended on the assumption that it would have stopped trading after the brief January 2001 rally, and so would have avoided the sustained decline

response to this approach seems inconceivable to us, and the lack of any evidence of damages seems as inevitable as it is fatal.

BPE's only remaining issue on the summary judgment for the Iantosca defendants goes to the breach of contract claim, which we address separately because of the Massachusetts rule that causation of damages is not an element of breach of contract, as a plaintiff is entitled to at least nominal damages upon proving a breach. See Nathan v. Tremont Storage Warehouse, Inc., 102 N.E.2d 421, 423 (Mass. 1951). We affirm this portion of the district court's judgment on the ground that the assignment order was not a contract. Whereas the elements of a contract include voluntary offer and acceptance, Quinn v. State Ethics Comm'n, 516 N.E.2d 124, 127 (Mass. 1987), BPE did not bargain for, offer, or accept the assignment order, which was imposed on it over its strong objection. The Massachusetts courts have instructively held that a form listing probation conditions is not a contract because its "enforceability . . . is derived not from the agreement of the defendant, but from the force of the judge's order." Commonwealth v. MacDonald, 736 N.E.2d 444, 447-48 (Mass. App. Ct. 2000); accord Commonwealth v. MacDonald, 757 N.E.2d 725, 727 (Mass. 2001) ("The probation form is not a contract."). By the same token, the assignment order is not a contract.

---

that followed. This assumption of market clairvoyance is not what the record suggests.

What we have said about the fatal flaw in the tort claims also disposes of the appeal from the dismissal on a Rule 12(b)(6) motion of all claims against the attorney defendants and the CUTPA claim against the Iantosca defendants. Iantosca, 686 F. Supp. 2d at 143-45. It is true that the district court's decision at the stage of the proceedings before summary judgment relied on the scope of duty owed by lawyers to non-clients and the meaning of the Massachusetts and Connecticut consumer protection statutes. But there is no need to get to these state law issues because even if these claims had survived a motion to dismiss, they would have failed on summary judgment owing to BPE's failure to provide evidence of causation of damages. See note 8, above. BPE's theory of damages was identical for the dismissed claims and for the surviving ones (that it was harmed because it was prevented from presenting an arbitration claim that would have won more than $12.6 million), and there is no reason to doubt that its failure to proffer any supporting evidence would have proven equally fatal to the claims dismissed. Neither at summary judgment nor in briefing and argument here has BPE suggested that the dismissal as to the attorney defendants affected access to any indication of damage causation or discouraged the proffer of any such evidence. We therefore affirm the district court's dismissal as to the attorney defendants and the CUTPA claim on the ground that the claims

affected would inevitably have failed at the summary judgment stage.

**<u>Affirmed.</u>**